Good morning, Your Honors. My name is Thomas Sines and I represent the plaintiff, Ana Ayala, in this action. I would like to reserve four minutes for potential rebuttal. Mr. Sines, if you could try to watch the clock and save some time of your argument for rebuttal. I will do my best to save time. I'll try to help you out of this. Thank you. I appreciate that, Your Honor. This action arises because of Ms. Ayala's experience of discrimination in seeking to finance the purchase of a car. She experienced that discrimination in the form of a blanket, facially discriminatory policy by the defendant, Spokane Teachers Credit Union, that barred the credit union from considering at all any non-citizen except a green card holder for any loan. We are before this court because the district court granted defendants motion under Rule 12b-6 to dismiss on the pleadings. The court did so on two apparent grounds. First, the court seems to have concluded that Ms. Ayala was not denied credit services because she was granted credit for the car purchase, first by the auto dealer, and second by GISA Credit Union, which took over the installment contract she had signed with the auto dealer. Of course, the granting of credit services by a third party, in this case the auto dealer and then GISA Credit Union, does not immunize a denier of credit from its own discrimination and the consequences, in this case. Well, that's true in principle, but there's a gap or a link here. And so maybe you can explain to me from a legal point of view, how is it because she doesn't contract with the credit union here, correct? She would ultimately. No, would she? Yes. Or would the dealer? The dealer would sell the paper, in effect. There would be two contracts. First, Your Honor, a deal between the auto dealer and the credit union transferring the contract between Ayala and the dealer. And then there would be a contract, ultimately, between Ayala, who would make her payments, to the credit union. So what's at issue here is the second potential contract between STCU, the defendant, and Ms. Ayala. So not the first contract, which the district court seemed to believe was at issue. Not at all are we contesting what occurred or didn't occur between the credit union and the auto dealer. Rather, it's the failure, for discriminatory reasons, to form the second contract. The contract between Ayala herself, who would make payments, to the credit union on the basis. That contract is contingent upon the credit union moving forward with the car dealer's contract, right? That's correct. But that's of no particular moment to liability. But it's a moment if they decide they're not going to do it. Well, they can't decide not to do it for discriminatory reasons. And that's what occurred here. This is a quintessential contract formation case under Section 1981, where Ms. Ayala sought to achieve a contract with the credit union, and could not do so because of a discriminatory policy that denied any consideration of all non-citizens except green card holders. So when you say she sought the contract, how did she seek the contract? Well, Your Honor, she bought the car.  And her understanding was that a contract with STCU was possible because of an application she believed was made on her behalf by the auto dealer. So the auto dealer conveyed to her, hey, we're in conversations and have given your information to STCU, and they need more information. Right. So in the complaint, though, it's pled differently. I mean, I read paragraph 16 does not say what you just said. It was pled differently because Ms. Ayala, who is not sophisticated in financial matters, believed an application was made on her behalf in her name to STCU. She had that belief for two reasons. One, as I mentioned, the auto dealer conveyed to her, we've sought a loan for you with STCU, but they need additional information, which was her Social Security card, and she provided it. The second reason that she believed she had had an application made on her behalf to STCU was she received a notice of action from STCU saying that credit had been denied to her. So in her view, an application had been made. It turns out that was not the case, as I've explained. But again, that's not a particular moment because she had no reason to consider actually applying herself directly because she knew there was a facially discriminatory policy. So I'm just trying to understand how far your theory would go. So I'm going to offer you a hypothetical. So let's say I enter into a contract with eBay or Amazon to sell goods, and they say, look, we're going to try to get into a contract with someone else to buy your goods. And then that third party says, you know what? I only want to buy American. I only want to buy from U.S. citizens. I want to buy from people who have served in our military. And your client doesn't fit into any of those categories. But Amazon and eBay told me that they were really going to try to market my goods to this third party. Under your theory, could I then sue that third party under 1981?  Unfortunately, there's no immunity granted simply because you act through essentially an intermediary. So that seems to be a pretty big expansion of liability. If any time someone on eBay doesn't want to buy my product, I can sue them under 1981? Again, it would have to be for a discriminatory reason. You have to be aware of that. Someone says, look, I only want to buy from U.S. citizens. I don't think that's an expansion, Your Honor. I think that's what section 1981 says. So you think the law right now, if someone says when I shop on eBay, I only want to buy from U.S. citizens… When I'm trying to sell on eBay, I have a cause of action against all of those people. If they have a policy that says we only buy from U.S. citizens, yes. Or just an individual. I mean, just an individual says I only want to buy from U.S. citizens. Again, if that's that individual's ongoing policy and you can prove it, yes, that's a section 1981 violation. I guess the question, section 1981 is a contract section in effect, right? Yes. And it's here under 1981. She attempted to contract for certain services. But the question is, did she? Because although she was mistaken in her complaint, the reality was she didn't contract for anything. Well, no, she did attempt to contract. This is a contract formation case. So, yes, she did not get a contract, as in any contract formation case. I would just say that the contract formation is with the car dealer, right? No, Your Honor. Contract formation cases under 1981 involve contracts that are not made for discriminatory reasons. But her contract, I mean, as I said, I started out in the questioning, 1981 boils down to contract situation. It's a very unusual statute, as you know. So the question is, did she contract for anything? And as I understand your answer is, well, no, she didn't contract with the car dealer, but that ultimately it would flow through to the credit union. Is that right? No, Your Honor. Our argument is that as in all contract formation cases under section 1981, she was not able to form the contract for discriminatory reasons with STCU. Full stop, period. The other contract is simply context that we don't believe has any legal impact here at all. Well, you wouldn't get to number two if you didn't have the first contract, right? Well, no. She could have gone. Well, okay, then that raises another question. You said it would be a futile gesture for her to have gone to the teacher's union directly. But I don't think that argument was raised in the district court. Your Honor, futile gesture is just another way of arguing that she was denied discriminatorily contract formation even without a formal application. It's not a new claim. It's not a new contention. And as you know, this court considers this matter de novo because it is a 12B6 motion to dismiss. So I don't think there's much to do with the contention that somehow we didn't use the magic words futile gesture and that somehow bars us from doing it. The point is, this is like all 1981 contract formation cases, the refusal to enter a contract for discriminatory reasons. There is, first of all, no dispute at this point in the case that there is a discriminatory policy. It is a blanket, facially discriminatory policy. The only question is whether Ms. Ayala was really interested, sincerely, and able to enter a potential contract with the credit union and was barred by that discriminatory policy. She clearly was sincerely interested. She had the car. She needed financing to keep the car. So she was sincere and genuine, able and ready to enter a contract. And, in fact, she ultimately did find one with GISA Credit Union. That, of course, doesn't absolve STCU of liability because it was on different terms, as we alleged in the complaint, less favorable terms, and she's entitled under Section 1981 to equal treatment with all others, including all the terms of the contract. And even if it was on equal terms, the Supreme Court has recognized multiple times that there is a sting from discrimination that exists regardless of whether there are other damages involved. So we have, clearly, a facially discriminatory policy that discriminates on the basis of alienage. We have a willing potential contracting party in Ms. Ayala. She needed to finance the purchase of that car. And we have a refusal to enter that contract, though conveyed through a third party from STCU, as a result of their discriminatory policy. That is a quintessential Section 1981. Counsel, I have a question, if I may. Could the teachers' union consider its credit risk and whether someone who wasn't a citizen or green card holder could pose more risk on the law? So, Your Honor, I see that my time for rebuttal, I'm getting into it, but let me answer it. That's why I've emphasized that this is a blanket policy that refuses to consider at all any non-citizen except a green card holder. Yes, the answer to your question is they can in the course of doing underwriting, making a specific determination about credit worthiness, they can consider immigration status. Federal law and regulation says that. But what's going on here is a blanket refusal to delve into any of those matters of underwriting or credit worthiness on the basis of the fact that Ms. Ayala is not a citizen and not a green card holder. That's why it's different than considering it as a part of the overall. Thanks, Counsel. You've answered my question. Thank you, Your Honor. Do you want to reserve the rest of your time? I will reserve the rest of my time for rebuttal. Thank you. And go to Ms. McGair. Yes. It's always hard to know the right pronunciation. McGair is perfect. I get a lot of different variations, so thank you. Good morning. May it please the Court, my name is Kimberly McGair. I'm counsel for Defendant Spokane Teachers Credit Union, which I will refer to as STCU, this morning. As the Court has already recognized, this is a 1981 case, and it involves a very narrow question, which is the right to make and enforce contracts. And the question before you is very narrow as well, which is whether the plaintiff has sufficiently alleged that STCU denied plaintiff the right to contract for credit services. The trial court properly found that STCU did not deny plaintiff the right to contract for credit services. In an effort to create, I think, the illusion of a denial by STCU, the plaintiff has really confused and mischaracterized the operative facts. Very clear, there would be no new contract. There would be no second contract. The contract itself makes this very clear. It's at ER 13 to 18, and on page 17 is the assignment. It is a single line at the end of the retail installment contract, and it says, the dealer hereby assigns its rights to so-and-so. And in the reply brief, plaintiff makes, for the first time, an argument that this is a novation. It is not a novation, and this case isn't in my brief because it was raised in the reply brief, but it is ‑‑ I'm not going to get to it. Sorry, Boutinay v. Seconds. Is that not ‑‑ that's not in your brief because it was in the reply? Yes. You know what might be helpful is if you would also send us a 28J letter. Okay. Just so we have it in writing. But go ahead with your argument.  Thank you. Essentially, this case, 12 Walsh, App. 2nd, 1029, makes the distinction between assignment and novation. And a novation is the mutual agreement among all parties to discharge a valid existing obligation by substitution of a new valid obligation or of a new party. Assignment occurs when a party to a contract transfers their rights or benefits under the contract to another person. That's what's at issue in this case. Plaintiff goes to the car dealer. She applies for credit from the car dealer. She gets credit from the car dealer in the form of the retail installment contract. The contract from the dealer's standpoint is complete when it delivers the vehicle to her, which it did. It then goes out in the market and just tries to sell the payment stream. That's all that was left under this retail installment contract. And STCU declined to buy the contract. It declined to buy the payment stream. For discriminatory reasons. That's the allegation, obviously. Well, that's the allegation. That's the purposes of today's motion, yes. But it did not deny her credit. And what's important if you look at, we don't have a ton of Ninth Circuit case law on this issue, but Lindsay v. SLT Los Angeles, which is in my brief, sets out the elements. And importantly, the gravamen of a 1981 claim is that the plaintiff did not get the contract. She did not get the services. And it's more developed in your district court case law, the Brown case, the Clark v. Safeway, where they look at the other circuits who have had to look at this in more detail, particularly in the retail context. And they talk about, well, it's just being in the store enough. No, that's not enough. You have to have tried to form a contract, and the defendant must have denied you the right to contract, denied the service, denied the good. That didn't happen here. Let's just follow Mr. Sands' argument, though. The assignment would put her in direct obligation to the credit union, correct? That's true, but it's also not legally relevant, because it isn't just that the credit union, whether or not the credit union declined to buy the contract. She had to not have gotten the service. And she got the service. She got the credit. She got it from the dealer. She had it before the credit union ever entered the picture. So there was no denial of credit services. She might kind of disagree, because if she got it, she didn't get the car. She did. She got the car. She drove it off the lot that day. She never gave it back. She had that credit. Yeah, with that credit. No new contract. It's unclear what happened with the second credit union. None of that's in the record. Well, but that's because the reason she drove it off is they were able to assign it to somebody else, right? Probably, yes. All we know is they don't let you drive the car away until they get all the papers in order. We all know that. Yes. And we know she didn't get it with your credit union, so we presume she got it somewhere else. But does that fix the problem that arguably your credit union discriminated against her? It does fix it. Well, I don't think it's a problem, but it fixes it from a legal standpoint. Allegation. Because I think there's a conflation of what happened here that is really important to separate legally. I think we all think about this being an application to a credit union and then a second credit union, but it really isn't as a legal matter. As a legal matter, this dealer gave this plaintiff credit, and then the dealer decides, I don't want to carry this paper. And I'll acknowledge that this happens in a regular course all the time, but regardless, from a legal matter, her contract with the dealer is finished when they sign the retail installment contract. Dealer then goes out separately in the world and says, I don't want to carry this paper. I'd rather have cash. And they go to the lenders and say, could you please buy this from me? But she has the dealer couldn't go to her and say, give me the car back. They've entered into a binding final contract whereby she received credit, and that's the problem with plaintiff's claim is that she was never denied credit, whether not by STCU and not by anyone else. And that is an essential element of a 1981 claim is that the plaintiff was unable to make a contract, and that's not what happened here. And plaintiff makes a good analogy in their brief to an employment contract and says, well, just because I can get a job with Employer B doesn't mean that Employer A's discrimination doesn't matter. I agree. But in that circumstance, Employer A denied the job, and then Employer B granted the job. That's not what happened here. Plaintiff went to the dealer, not to STCU, not to GISA, not to anyone else. She went to the dealer. She said, I'd like to buy a car on credit. Archibald said, sure. Here's our deal. You sign it. I sign it. You take the car. There was no Employer B. She didn't go to anyone else. It's not a mitigation issue. She received credit from the dealer, and the credit union simply chose not to enter into a contract with the dealer, and that's not a discrimination against the plaintiff. And, again, if we just look at those specific elements in Lindsay v. SLT, the plaintiff hasn't pled them in this case. And I think plaintiff has to try to sort of conflate this and convince you that she would have gotten this new contract. I think even in the reply brief, plaintiff says, well, the new contract would have had different terms, and it would have perhaps had a different interest rate. That's just not true. And the contract itself makes that very clear. You can read it for yourself. It would have been an assignment of this contract. And, again, I think it's even a stretch to say the plaintiff would have then been in contract with the credit union because the plaintiff's finished, or the dealer's finished. The credit union's not delivering her any service. It just bought a payment stream. It's as if I entered your – hypothetical was better than mine, but mine is I loan someone $5,000. I take a promissory note. I decide I don't want to take the payments. I want my $5,000 back. I sell it to somebody else. That's – there's not a new promissory note in that circumstance. It's the same existing promissory note. And so I think we – it's – if I'm plaintiff, sure, I want to focus on this allegation that STCU had a facially discriminatory policy, but that's not what the district court looked at, and it's not the right analysis because the right analysis is whether this plaintiff experienced a loss of services, whether this plaintiff was denied the right to enter into a contract. Let's see where I – what I haven't covered. And I think it's important to look at, as well, again, this is a unique case, and the plaintiff hasn't cited a single Section 1981 case anywhere in the nation where a consumer received the only services that they sought from the only party from whom they sought them, but a court found the plaintiff could still make a 1981 claim against somebody else, against a third party, or to use Judge Owens, your analogy, absolutely. If we've got that – I'll use Amazon because eBay is a little more complicated. Amazon buys the product. Amazon goes to sell it to the consumer. That consumer says, I only want to buy U.S. products. I'm not going to buy that. If Amazon refused to buy from the seller because I don't want to buy from – sure, that's a violation, but if that consumer just chooses not to buy the product from Amazon, that consumer is not discriminating against that individual seller. That consumer is refusing to enter into a contract with Amazon, and that's not the same thing. And that seller, to take the analogy further in this case, that seller wasn't denied the right to sell to Amazon, so the seller hasn't experienced the 1991 violation whatsoever because they weren't denied any kind of right to service. I don't know if I need to address the feudal gesture argument. I would argue two things. One is it definitely wasn't raised below, and I think it's relevant and is an argument under our Ninth Circuit authority that it should have been raised below and the district court should have had an opportunity to address it. But more importantly, I don't think it makes any difference because, again, it doesn't fit here. In a feudal gesture case, again, is so-and-so says we don't contract with people of this race, and the courts say you don't have to file an application and have it denied in order to make that sort of claim. But that's not the case here. Again, in the feudal gesture case, the plaintiff still doesn't have the job, the service, the benefit, whatever it was, they didn't get it. And that's, again, in this case, before STCU ever enters the picture, plaintiff has the service that she wants. And so the feudal gesture just doesn't fit here. If, for example, plaintiff didn't go to the dealer, didn't receive credit from the dealer, didn't seek credit for the dealer, walked into STCU and said, I'd like a loan, and STC said no because of DACA, that would be a very different case. But that's not the case that we have here. And we have to apply the Section 1981 authority that we have to the case in front of us to determine whether those elements are established. I do want to just briefly touch on the issue of the Judge Gould that you raised, which is just, and the district court didn't touch it, but if the court were to get that far, we maintain that the allegations in this complaint also do not state a claim for alienage discrimination. They state a claim for discrimination on the grounds of immigration status. And there's a lot of case law down in the district courts in the Perez case and a lot of the other Wells Fargo cases that wrestle with this issue of how do you balance ECOA, the Equal Credit Opportunity Act, and Section 1981. I don't think we have to get there. What we have here is an allegation, and yes, there are allegations in the complaint, I will concede, that plaintiff says, I was discriminated against on the basis of my alienage. And perhaps you have to accept that at a 12B6 standard. But if you read the complaint as a whole, it is, I was discriminated against because I am a DACA recipient. And that is immigration status. And Section 1981 does not outlaw discrimination based on immigration status. And ECOA and the CFPB, and these authorities are all in our brief, make very clear that lenders are permitted to consider immigration status for precisely the reason that you said, Judge Gould, which is that it is an underwriting question. And even as we were drafting the briefs in this case, the CFPB was still affirming that lenders may consider immigration status when deciding to make a loan. Now, again, credit union didn't make a credit denial here. But that is the allegation in the complaint. And I think that a determination that the credit union did not discriminate against Ms. Ayala based on alienage discrimination, given the full context of her claim, which is clearly based on DACA, is a separate grounds by which the trial court's decision could be affirmed. I don't have any. I'm happy to answer any other questions that you have, but I don't have anything further. Any questions? Thank you. Hearing none, thank you. As your honors all know, Section 1981 is a post-Civil War statute. It has contract in its broadest sense possible. Whether it's an assignment or an ovation or a wholly new contract, a contract under Section 1981 is agreement with consideration between two parties. In this case, that contract in essence would have been Ms. Ayala will pay a monthly basis to the credit union, and in return the credit union will ensure she gets to keep the car, but it's not repossessed. That's the contract that would have been formed but for the discriminatory policy. That policy is a blanket policy that says we will not consider you, we will not do any underwriting, we will not evaluate your ability to pay unless you are a U.S. citizen or a green card holder. That is not considering, that is making alienage a dispositive determination when it comes to whether or not to form the contract. That's what at issue here, not considering it in the course of underwriting. If that were going on, it would be an entirely different case, maybe not a case at all. This is a blanket policy that says we will not consider in any way anyone who is not a U.S. citizen or the limited exception for non-U.S. citizens who are green card holders. There's a lot of discussion in the briefs by the defendant about these retail cases. The retail cases do have a lot to do with whether there is a clear enough nexus to a contract because those of course are oral implied contracts. I'm going to buy this shirt, I'm going to give you money to buy this shirt. That's the contract, it's oral, it's implied. This obviously would be a written contract that was not formed between the union and Ms. Ayala, a very different context. In many cases, those retail cases involve conditions of the contract, already made the purchase. What happened afterwards is that it had a sufficient nexus to be a condition of the contract. This is a contract formation case. But the best analogy I can come up with to the retail context is this. If Ms. Ayala and a friend walked into a store, maybe it's a store that sells clothes, or in this case, a store that sells loans, and the friend says to a sales clerk, my friend over there would like to buy this, do you have it in her size? And the sales clerk says to the friend, I'm sorry, we don't sell to her kind. Full stop. Now, does the fact that Ms. Ayala didn't, despite hearing that from her friend, take the article of clothing, go to the clerk and try to purchase it, make a difference? The answer is no. You read those retail cases, if that was the situation, sales clerk clearly said to a friend, no, we don't sell to that kind of person. That clearly would be an actionable discrimination under Section 1981 involving the oral and implied sales contract. Best analogy to those retail cases that are relied upon so heavily. Counsel, the clock has run out, unless my colleagues have questions. I want to thank both counsel for their excellent arguments, and that case shall now be submitted, and the parties will hear from us in due course. So thank you.
judges: McKEOWN, GOULD, OWENS